## HAGEMEYER TRADING CO. v. SAXMAN et al.

(Circuit Court of Appeals, Third Circuit. March 14, 1923.)

No. 2912.

Sales ⊜72(5)—Contract held to fix standard according to preliminary assay.

Under Uniform Sales Act, § 18, a contract for the sale of Argentine ore to a firm in Pennsylvania, which prescribed that the ore should be the usual good quality on the basis of preliminary assay showing a percentage of tungsten and of impurities, at a price determined by the per centage of the tungsten on basis of weights and assays by a designated firm, precribes the quality of the goods as determined by the preliminary assay, protecting the buyer by provision for final assay, so that the buyer could not reject the goods because final assay showed the impurities exceeded the maximum stated; where the preliminary assay showed they were less than the maximum.

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action at law by the Hagemeyer Trading Company, to the use of Hagemeyer Trading Company, Inc., against Marcus W. Saxman and others, trading as the Hudson Reduction Company. Judgment for defendants on directed verdict, and plaintiff brings error. Reversed, and new trial awarded.

Reynolds D. Brown, of Philadelphia, Pa., Grote & Grote, of Pittsburgh, Pa., and Yorke Allen, of New York City, for plaintiff in error.

Robert W. Smith and Smith, Best & Horn, all of Greensburg, Pa., and Reed, Smith, Shaw & McClay and John G. Frazer, all of Pittsburgh, Pa., for defendants in error.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

MORRIS, District Judge. This action at law was instituted by Hagemeyer Trading Company against Hudson Reduction Company

to recover the contract price of certain Argentine scheelite delivered by the plaintiff to the defendant. The trial court, holding that, by reason of its phosphorus content, the scheelite delivered was not that called for by the contract, directed a verdict for the defendant. That action of the court is here assigned as error by the Trading Company. The contract provides:

"New York, October 14, 1918.

"Messrs. Hudson Reduction Company, Latrobe, Pa.—We confirm having sold to you: * * *

"Article—About fifteen (15) tons Argentine scheelite, usual good quality, on the basis of preliminary assay showing 70 per cent. $WO_3$ or better, maximum phosphorus contents .05 per cent.

"Price—Twenty-six dollars ($26.00) per unit of 1 per cent. a ton of 2,000 lbs.

"Payment—75 per cent. cash against preliminary invoice, balance on the basis of weights and assays by Messrs. Ledoux & Co. which are final.;
* * *

"Shipment—November from Buenos Aires by steamer. * * *

"Delivery—f. o. b. Latrobe, Pa. * * *

"Any differences arising under this contract do not invalidate same, but, unless otherwise agreed, are to be settled by arbitration in New York.
* * *

"Hagemeyer Trading Co.,   Per F. E. Hagemeyer, President."

The preliminary assay of the scheelite made in Buenos Aires in November and that made by Ledoux & Co. in February, 1919, after delivery of the scheelite to the defendant, differed. While each assay disclosed upwards of 70 per cent. $WO_3$, tungstic oxide, the former showed less than .05 per cent. phosphorus; the latter showed 0.124 per cent. Upon receipt of the Ledoux analysis the defendant, who had not paid any portion of the purchase price, rejected the scheelite on account of its phosphorus content, and advised the plaintiff that the ore was being held by the defendant awaiting plaintiff's orders. After some correspondence this suit was brought.

The defendant contends that the words "maximum phosphorus contents .05 per cent." constituted a warranty under sections 12, 14, and 15 of the Uniform Sales Act, in force in New York and Pennsylvania, and that the phosphorus content, according to the Ledoux analysis, being in excess of .05 per cent., there was a breach of warranty, and that its action in rejecting the scheelite was authorized by section 69 of the Sales Act. The plaintiff, on the other hand, urges that it delivered to defendant scheelite which the preliminary assay showed to contain 70 per cent. $WO_3$ or better and less than .05 per cent. of phosphorus; that that was all plaintiff contracted to do; that consequently there was no breach of contract by plaintiff; that the only question raised by the Ledoux analysis was one of price or payment; that, under the express terms of the contract, this constituted an arbitrable "difference," and that the defendant refused to submit to arbitration.

These antagonistic contentions of the parties call for a construction of the contract. Section 18 of the Sales Act declares:

"For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade, and the circumstances of the case."

There is no evidence of any prior transactions between the parties. The one shipment embraced all the ore called for by the contract, and there were no dealings, other than the contract, between the parties with respect to that shipment prior to the delivery of the ore. There is no evidence as to usages of the trade. Hence we are left to the circumstances of the case and the terms of the contract in ascertaining the intention of the parties. The material contracted for was Argentine scheelite, an ore found in the Argentine, containing a high percentage of tungsten, or tungstic oxide, $WO_3$, the valuable ingredient of the ore, and sometimes impurities, for instance, phosphorus, in such quantity as to lessen the value of the ore. The contract discloses that when it was made the scheelite in question was located in the Argentine, the seller in New York, and the buyer in Pennsylvania. It was under these circumstances that the contract was made, designating the article sold, *not* as Argentine scheelite, containing 70 per cent. $WO_3$ or better, maximum phosphorus contents .05 per cent., but as "Argentine scheelite, usual good quality, *on the basis of preliminary assay* showing 70 per cent. $WO_3$ or better, maximum phosphorus contents .05 per cent." (Italics ours.)

The primary rules of construction require that the italicized words be not ignored. The defendant acknowledges this, but says those words have no meaning, "except to give a basis for the preliminary invoice for 75 per cent. of the price." This interprets the contract as if the words "on the basis of preliminary assay" were found after the word "invoice" in the clause pertaining to "payment," and not in the clause relating to the article sold. We think that such a transposition would make a new contract for the parties. The article sold is described by the contract as "Argentine scheelite, usual good quality." The contract likewise fixes its own standard, by which the existence or nonexistence of the required quality is to be determined, namely, the "preliminary assay showing 70 per cent. $WO_3$ or better, maximum phosphorus contents .05 per cent." That standard having been fixed by the parties as the test of quality, all other tests are excluded, and the preliminary assay thus became the sole and exclusive evidence by which to determine whether the ore delivered was of the quality required by the contract.

Nor does the discovery of such provision in the contract cause surprise or shock. On the contrary, it is one of the provisions that a person located in New York and contracting for the sale of ores to be brought from the Argentine and delivered in Pennsylvania might be expected to insist upon having in the contract, at least if made during the war, as was the contract in question, in order to eliminate his risk of having the ore rejected after delivery by reason of a difference between the analysis made before shipment and one made after delivery. To minimize the loss which he might sustain by reason of a possible difference in such analysis, he might also be expected to require the payment of at least a portion of the purchase price to be made, unconditionally, in accordance with or on the basis of the preliminary assay. The contract contains such provision, also, for it says, "Payment—75 per cent. against preliminary invoice,  *   *   * "

and there was nothing save the preliminary assay upon which the preliminary invoice could be formulated.

The buyer did not, however, assume all the risk incident to a purchase upon preliminary assay, for the contract, after providing for the payment of 75 per cent. cash against preliminary invoice, adds, *"Balance* on the basis of weights and assays by Messrs. Ledoux & Co., which are final." (Italics ours.) The apportionment of risk between the parties was a proper matter to be fixed by the contract, and a natural one in the circumstances. This clause completes that apportionment. Moreover, when the clause under consideration is read thus, "Balance on the basis of weights and assays by Messrs. Ledoux & Co.," it is, we think, quite obvious that the Ledoux weights and assays relate only to the ascertainment of the "balance" of the purchase price. It is, as we view the matter, equally clear that the addition to that clause of the words "which are final" does not enlarge the effect or field of operation of the Ledoux analysis, but merely, and for the benefit of the buyer, expressly makes that analysis, with respect to the limited matter to which it pertains, indisputable.

The amount of the "balance" called for by the contract must be determined as a fact by first ascertaining the value of the contract quantity of scheelite containing 70.97 per cent. $WO_3$ and phosphorus 0.124 per cent., the Ledoux analysis, on the basis that scheelite containing 70 per cent. $WO_3$ or better and phosphorus not exceeding .05 per cent. is worth $26 per unit of 1 per cent. a ton of 2,000 pounds. The amount by which such ascertained value exceeds 75 per cent. of the value of the contract quantity of ore having the quality shown by the preliminary assay, 72.20 per cent. $WO_3$, estimated at $26 per unit of 1 per cent. a ton of 2,000 pounds is the "balance." If, however, there is no excess, there is no "balance" in fact. In the latter event 75 per cent. of the value of the contract quantity of ore of the quality shown by the preliminary assay, 72.20 per cent. $WO_3$, estimated at $26 per unit of 1 per cent. a ton of 2,000 pounds, is, in fact, the actual and full contract price of the ore delivered.

For the foregoing reasons we are of the opinion that the act of the court below in directing a verdict for the defendant was error. In view of that conclusion, and what has been hereinbefore stated, it is unnecessary to consider specifically the remaining assignments of error.

The judgment below must be reversed, and a new trial awarded.